BERGGREN, APPELLEE, *v.* RIVER DOWNS INVESTMENT CO.
ET AL., APPELLANTS.

[Cite as Berggren v. River Downs Investment Co. (1978),
57 Ohio App. 2d 64.]

(No. C-76803—Decided April 12, 1978.)

Mr. *Terry M. Tranter*, for appellee.
Mr. *William J. Brown*, attorney general, and Mr. *Gary L. Schneider*, for appellants.

*Per Curiam.* This appeal essentially raises only one question for review, *viz.*, whether the decision of the referee disallowing petitioner's application for non-seasonal unemployment compensation benefits (subsequently reversed by the Court of Common Pleas) is supported by reliable, probative or substantial evidence and is in accordance with law. The issue is before us as a result of petitioner's application for unemployment compensation filed September 4, 1975. The administrator determined that petitioner, an employee at the River Downs racetrack for eighteen weeks during 1975, was entitled to seasonal benefits of $100 per week worked, or total seasonal benefits of $1800.

Petitioner appealed the administrator's decision to the Board of Review on the ground that her benefits should have been computed in accordance with the non-seasonal benefits schedule, since the horse racing industry in Ohio arguably does not qualify as a seasonal industry under R. C. 4141.33(A). The referee, acting on behalf of the Board, affirmed the administrator's finding that racing is a seasonal industry. After petitioner's application to institute a further appeal before the Board of Review was disallowed, she appealed to the Hamilton County Court of Common Pleas. The court, finding that racing is a non-seasonal industry, held that the administrator's decision was unlawful, unreasonable and against the manifest weight of the evidence and ordered that petitioner's benefits be recomputed "based on the racing industry being nonseasonal in nature." The instant appeal is taken from that decision.

R. C. 4141.33(A) reads in pertinent part:

" 'Seasonal employment' means employment of individ-

uals hired primarily to perform services in an industry which because of climatic conditions or because of the seasonal nature of such industry it is customary to operate only during regularly recurring periods of forty weeks or less in any consecutive fifty-two weeks. 'Seasonal employer' means an employer determined by the administrator of the bureau of employment services to have seasonal employment in a seasonal industry. Any employer who claims to have seasonal employment in a seasonal industry may file with the administrator a written application for classification of such employment as seasonal. Whenever in any industry it is customary to operate because of climatic conditions or because of the seasonal nature of such industry only during regularly recurring periods of forty weeks or less duration, benefits shall be payable only during the longest seasonal periods which the best practice of such industry will reasonably permit. The administrator shall determine, after investigation, hearing, and due notice, whether the industry is seasonal and, if seasonal, establish seasonal periods for such seasonal employer. Until such determination by the administrator, no industry or employment shall be deemed seasonal.''

The record discloses that the referee's finding that racing is a seasonal industry was based on two ''Journal Entries'' issued by the Administrator of the Ohio Bureau of Employment Services. The first, dated May 21, 1975, and effective retroative to March 2, 1975, stated in pertinent part:

''The Administrator hereby determines that the industry of horse race track operators in Ohio is a seasonal industry in accordance with Section 4141.33, Revised Code, and that such season is the thirty-seven (37) week period commencing on the Sunday of the week in which March 6 occurs in each year.''

The second journal entry, issued and effective on November 20, 1975, declared:

''The Administrator hereby determines that the industry of horse race track operators in Ohio is a seasonal industry in accordance with Section 4141.33, Revised Code,

and that such season is the thirty-four (34) week period commencing on the Sunday of the week in which February 6 occurs in each year.''

At the hearing before the referee, petitioner, the appellee herein, contended that these journal entries were erroneous, discriminatory and unconstitutional because the actual horse racing season in Ohio is longer than that established by the Administrator.[1] In support of that position, petitioner introduced the testimony of Jerry Neff, president of the local unit of the International Association of Theatrical and Stagehand Employees, the union representing mutuel workers and various other employees at River Downs. Neff testified that the 1975 racing season began February 28 at the Thistledowns thoroughbred plant in Cleveland and did not end until December 20, the conclusion of the standardbred meeting at Lebanon, Ohio. He further testified that the 1976 season commenced January 2 at Thistledowns.[2] Despite this evidence the referee ruled that he had ''* * * no jurisdiction to review the

---

[1] The referee determined that the second journal entry established the length of the racing season for 1976. As far as we can determine from the record, the earlier journal entry covered the 1975 season.

[2] Contrary to the finding of the trial court that "[t]he uncontroverted testimony in the transcript reveals that the actual racing season was from 2/28/75 to 12/20/75, and from 1/2/76 to 12/18/76 * * *," we find no testimony establishing that the 1976 racing season ended on December 18. The only reference to that date as the final racing date of the 1976 season appears in a letter from petitioner's counsel to the Board of Review applying for a further appeal of the referee's decision. Petitioner's counsel asserted therein that "[t]he actual racing dates for 1975 were February 28, 1975 to December 20, 1975, and for 1976 are January 2, 1976 to December 18, 1976 as I understand it." Appellee's "Motion to Take Judicial Notice of Dates Granted by Ohio Racing Commission for the years 1974, 1975 and 1976," the attached exhibits to which presumably would have verified that assertion, was overruled by this court on June 9, 1977. Thus, there was no evidentiary basis for concluding that December 18 was the end of the 1976 racing season in Ohio. Despite this gap in the record, appellants have never disputed petitioner's primary factual allegation that the actual racing dates in 1975 and 1976 spanned a period of 42 weeks and 50 weeks, respectively. We therefore perceive no impediment to a resolution of the legal issue raised by that factual posture.

constitutionality of the law or of the Administrator's actions under the law * * *" and upheld respondents' position that racing must still be considered a seasonal industry. Respondents, appellants herein, now advance as their single assignment of error that the trial court, in reversing the referee's decision, exceeded the scope of its reviewing authority. We disagree.

Division (O) of R. C. 4141.28, titled "Claim for benefits; procedure," states in pertinent part as follows:

"If the court [of Common Pleas] finds that the decision [of the Board] was unlawful, unreasonable, or against the manifest weight of the evidence, it shall reverse and vacate such decision or it may modify such decision and enter final judgment in accordance with such modification; * * *."

Division (O) further states that the trial court, in hearing the appeal of the Board's decision, is limited to a review of the "* * * record certified by the board."

The issue the trial court confronted was whether petitioner was a seasonal employee within the meaning of R. C. 4141.33(A). Under that section an employee is not considered seasonal unless he is "* * * hired primarily to perform services in an industry which because of climatic conditions or because of the seasonal nature of such industry it is customary to operate only during regularly recurring periods of forty weeks or less in any consecutive fifty-two weeks." All the evidence in the transcript of the hearing before the referee, which was before the lower court, established that the racing industry in Ohio operated in excess of 40 weeks per year during 1975 and 1976; consequently, on the record before it, the trial court did not err in finding the decision of the board, blindly following the Administrator's "Journal Entry" determinations that the racing season was 34 weeks and 37 weeks, respectively, unreasonable and against the manifest weight of the evidence.

This court recognizes that the Administrator's journal entries relied upon by the Board could conceivably have been based on evidence that the racing industry in Ohio

remains seasonal despite the fact that the industry in 1975 and 1976 operated virtually year round.[a] However, such evidence, if indeed there was any, is dehors the record certified by the Board to the court below.

We are not persuaded that our holding today is in conflict with the Supreme Court's decision in *Beulah Park Jockey Club* v. *Garnes* (1973), 36 Ohio St. 2d 143. In that case the Administrator of the Ohio Bureau of Employment Services revoked the classification of racetrack operators as seasonal employers based upon his conclusion that the Ohio Racing Commission authorized horse racing meets for 1971 to include dates from January 9, 1971, through November 20, 1971, a period of forty-six weeks. The court, in upholding a reversal of the Administrator's finding, relied on evidence in the record which showed that the

---

[a] The last sentence of division (A) of 4141.33 states that the Administrator of the Ohio Bureau of Employment Services "* * * may adopt rules and regulations for implementation of this section." Pursuant to that rule-making authority, the Administrator is charged with the responsibility of rationally interpreting the intent of the legislative language in division (A) that "* * * '[s]easonal employment' means employment of individuals hired primarily to perform services in an industry which because of climatic conditions or because of the seasonal nature of such industry *it is customary* to operate only during regularly recurring periods of forty weeks or less in any consecutive fifty-two weeks." [Emphasis added.] Under this rather broad definition it is, of course, possible to reach various conclusions as to why the racing industry might still be entitled to a "seasonal" classification. See *Boruta, Beulah Park Jockey Club* v. *Garnes: Seasonal or Non-Seasonal, That is the Question*, 1 Ohio North. L. Rev. 561 (1974). The Administrator conceivably could have determined, for example, that even though racing at the state's thoroughbred and standardbred tracks was conducted during "regularly recurring" periods of forty-two weeks in 1975 and fifty weeks in 1976, it is still "customary" in Ohio, because of climatic conditions or because of the seasonal nature of the industry, to operate less than forty weeks in any given year. However, such a determination, together with evidence to support it, was not made a part of the record. Rather the Administrator was content to baldly assert in his two "Journal Entries" that the racing season spanned thirty-seven weeks in 1975 and thirty-four weeks in 1976. Since these findings could not be sustained in the face of claimant's uncontroverted evidence to the contrary, the trial court had no alternative but to hold they were unreasonable and against the manifest weight of the evidence.

racing season exceeded 40 weeks in 1971 only because Toledo-Maumee Raceways had applied for, and was granted, an exceptional permit from the State Racing Commission to operate from January 9, 1971, to March 8, 1971, due to economic competition from Detroit, Michigan, area racetracks. The court further noted that all 17 other racing associations which sought permits for the 1971 season requested dates within the "customary regularly recurring 40-week period * * *." *Beulah Park Jockey Club* v. *Garnes, supra,* at 145. Hence, the Court's conclusion as follows, at 146:

"* * * [T]he board had absolutely no evidence before it of any change of climatic conditions or its effect on the horse racing industry as to any change in the seasonal nature of horse racing. The single change in 1971 from prior years was the instance of one racetrack in Ohio which was permitted to operate during the winter months solely because of extreme economic competition. The record is devoid of any evidence that the reason for this winter operation was a change in climatic conditions or a change in the seasonal nature of horse racing. Absent such evidence, it is customary for horse racetracks to operate during regularly recurring periods of 40 weeks or less and the horse racetrack industry is entitled to a classification of seasonal employment as described in R. C. 4141.33(A)."

Unlike the situation in *Beulah Park Jockey Club,* there was no evidence herein from which the board reasonably could have found that it is customary for the horse racing industry to operate less than forty weeks per year. On the contrary, all the evidence of record led to the inescapable conclusion that the sport is now a year-round enterprise unaffected by climatic conditions or other seasonal considerations.

The majority opinion in *Beulah Park Jockey Club* includes what appears to be a favorable—and gratuitous—reference to an earlier appellate decision, *In re Application of Race Tracks* (1956), 103 Ohio App. 503, which could be construed as inconsistent with our decision today. There, the acting Administrator of the Bureau of Unemployment

Compensation determined that because certain tracks maintained employees for as long as eleven months during a yearly period, employment at the tracks was not seasonal within the meaning of R. C. 4141.33(A).

The appellate court reversed a judgment of the Common Pleas Court affirming the administrator's ruling, holding at pages 505, 506:

"It is our opinion that, by reason of and without respect to the statute and by common knowledge of which courts could take judicial notice, the operation of the sport of horse racing in Ohio is seasonal, especially is this true if the operation is conducted for profit."

By way of dicta, the court further reflected:

"Manifestly, race meets conducted out of doors in the winter months would attract little or no attendance. * * *

"Had the Legislature included the winter months during the time when race meets might be conducted it would not have affected at all the practical operation of racing in Ohio, and horse racing would remain a seasonal sport."

We respectfully disagree with the Tenth District's view that horse racing in Ohio must be considered a seasonal sport regardless of the statutory guidelines in R. C. 4141.33. The judiciary of this state may not blithely ignore the enactments of the legislature by substituting its own "common knowledge" in lieu thereof, particularly when that common knowledge is erroneous and not a proper subject for application of the judicial notice doctrine in the first place. See *State* v. *Noiman,* unreported, First Appellate District, No. C-76402, decided July 13, 1977. Accordingly, to the extent that *In re Application of Race Tracks* conflicts with our decision herein, we decline to follow it.

For the foregoing reasons, we affirm the decision of the trial court.

*Judgment affirmed.*

PALMER, P. J., KEEFE and BETTMAN, JJ., concur.